IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 22-cr-2053 MLG |
| | ) | |
| **JOHN LOPEZ,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>UNITED STATES' SENTENCING MEMORANDUM</u>

The United States files this sentencing memorandum and asks the Court to impose a sentence at the very bottom end of the guideline range. It also requests the Court impose all the conditions listed in the attachment to the PSR, Doc. 27-1. A separate restitution request is forthcoming. 18 U.S.C. § 3664(d)(5).

## BACKGROUND

*Offense conduct and prior criminal history*

The Defendant, Lanette Bashore, pled guilty to one count of mail fraud. Doc. 26 ("Plea"). The scheme to which she pled was long-running. *Id.*; Doc. 2. Beginning in approximately 2001, Bashore, often through a mutual acquaintance,[1] falsely represented to many people in New Mexico and elsewhere that she held ownership in and of a large fund, but that the vast proceeds of the fund were inaccessible until various costs were paid or legal holds on it were resolved. Plea at 4; *see also* Doc. 27 at ¶ 19 ("PSR") (noting Bashore told one victim that she held a three hundred-million-dollar fortune). Bashore also falsely represented to individuals that, if they sent her money upfront

---

[1]The acquaintance was a woman named Jacqueline St. James.

to cover these various fees, she would pay them back with significant interest. *Id.* The "deal" she often represented was, if you paid her $5,000, she would pay you back $250,000. Sentencing Exhibit 1.[2]

As it turns out, there was no fortune. And there were no costs locking it down. Bashore was running a scam and a timeworn one at that.[3] In all, she took hundreds of thousands of dollars from over a dozen victims and used their money to pay for her lifestyle and to gamble. PSR ¶¶ 23, 40.

Many of Bashore's victims did not sit on their hands. They frequently inquired with Bashore as to the status of their payout, and, when they did so, Bashore lied to them again. She told them, for example, that checks had to be rewritten, delaying the process, or that the attorneys she had were working on it, or that a judge had to sign off on certain documents before investment returns could be disbursed. These lies continued for some time – there was always some reason Bashore could not pay her victims back.

---

[2]The upfront fee and payout would vary depending on the victim, but the fee-to-payout ratio always disproportionately favored the payout.

[3]This particular type of con is sometimes called an "advance-fee scam." *See Southway v. Central Bank of Nigeria*, 328 F.3d 1267, 1269-70 (10th Cir. 2003) (describing a similar "advance-fee" scam to the one Bashore executed); *United States v. Dupre*, 462 F.3d 131, 134 n.3 (2d Cir. 2006). But the contours of the scam are an old one, going back to at least the 19th century where it was known sometimes as the "Spanish Prisoner" game. In that scam, the con-artist would send a letter to an unsuspecting gentleman, often representing himself as a friend of a friend and, tragically, as a political prisoner. Always, the writer had some large sum of money hid and for a fee upfront, either to get him out of jail or to secure the fortune in some fashion, the writer would later split the fortune with the letter's recipient. *See An Old Swindle Revived: the 'Spanish Prisoner' and Buried Treasure Bait Again Being Offered to Unwary Americans*, The New York Times at 12 (March 20, 1898); *see also Owens v. United States*, 221 F.2d 351, 355 (5th Cir. 1955); *Memoirs of Vidocq, Principal Agent of the French Police until 1827*, Francois Vidocq, Eugene, at 58-59 (1834) (describing a similar scam, where the writer was frequently imprisoned by a "bitter jacobin"). As with here, there never was any fortune.

In approximately 2023, the FBI opened an investigation into Bashore. As part of that investigation it interviewed victims, gathered banking documentation, and collected other information about Bashore. FBI agents and an inspector with the United State Marshal's Service also interviewed Bashore at her gated apartment complex in San Diego, California.[4] In that recorded interview, Bashore generally denied any sort of scam. She said, generally speaking, that the money she received from people were loans.

Within 24 hours of that interview, however, she called several of her victims to let them know the FBI had come to visit her. In one of those calls, which the victim voluntarily recorded, Bashore told the victim:

> The only thing is if you would just say that it was a loan that was it and not a gift and that I was going to pay you back. Any corporations, any business, any attorneys, they don't exist now. . . . I want the money, I want money to pay you. That's all I want. . . . Because if not, if people are going to be negative and say about attorneys and money and investments and everything, it's going to zero out and I won't pay. If people are positive about me, that it was a loan, everything will be ok. . . . Don't talk about attorneys or anything. Please.

*See* Doc. 2. at 4; PSR ¶ 33. A sentencing enhancement for obstruction was applied for this conduct. *Id.*

The scam Bashore executed here is not the first time she has committed fraud. In 1995, she pled guilty to one count of mail fraud in California. PSR ¶ 66. As described in the PSR, the scheme in that case involved falsely representing to investors that she intended to purchase existing home at bargain prices, fix them up, and resell them for a substantial profit. *Id.* Bashore did none of these things; instead she pocketed investor money and used it for her own personal purposes. *Id.* For that conduct, she was sentenced to 15 months imprisonment and $350,000 restitution. *Id.* She paid only $33,000 of that restitution back. *Id.* ¶ 135 at 27.

---

[4] The apartment complex's website: https://www.legacyapartmentsmiramesa.com/

Bashore's fraud in this matter has deeply impacted her victims.  Almost all of them have lost thousands of dollars, and many of them have lost tens of thousands.  PSR ¶ 41.  Others have endured even more.  Two of them sold their home and adjacent land and move into a smaller home because of their investments with Bashore.  *See* PSR ¶ 45.  Several victims plan to speak at sentencing.

*History and characteristics*

Bashore is 80 years old.  PSR at 2.  She has had several aliases over the years and more than one social security number.  *Id.*  She has little-to-no history of legitimate employment.  PSR ¶¶ 101-103.  She reported abuse and abandonment as a child.  PSR ¶¶ 75-76.  She declared bankruptcy in 2015 and was granted a discharge.  PSR ¶ 112.

Though in her early 80s, Bashore reported that she was in "good health."  PSR ¶ 88. [5]  She takes no medications.  *Id.* ¶ 89.  A forensic mental health evaluation yielded evidence of anxiety and depression.  Doc. 32 at 6.  Bashore denied a history of mental or emotional diagnoses.  PSR ¶¶ 94-95.  She has no history of substance abuse.  *Id.* ¶ 96.

## ARGUMENT

The United States respectfully requests a sentence at the very bottom end of the guidelines. [6]  First, the nature and circumstances of the offense support such a sentence.  Bashore executed a long-running scheme to deprive hard-working folks of their earned savings.  The total amount of the fraud is hundreds of thousands of dollars.  She swindled over a dozen victims, causing substantial financial hardship to at least one.  PSR ¶¶ 30, 40.

---

[5] There is documentation suggesting a potential medical issue.  *See* Doc. 32-1; *see also* Doc. 32 at 5 (discussing that issue).

[6] The United States has no objections to the PSR.

Her history and characteristics further support incarceration.    The United States acknowledges her age would typically put downward pressure on the sentence given that recidivism typically decreases with age.  But her history of a fraud conviction in 1995 coupled with this long-running scheme involving multiple victims over two decades with little-to-no history of employment suggests habitual violations of the law even in her advanced age.  This is not a woman who made a mistake; this is a woman with a commitment and purpose to swindle others.  To the extent that testing indicated low I.Q., Doc 32-2 at 8, her history of fraud suggests high emotional intelligence.  She knows how to gain people's trust and exploit it.  That she has already served a period of incarceration of 15 months for her prior conviction also puts upward pressure on her sentence.  18 U.S.C. § 3553(a)(2)(C) (discussing specific deterrence).

As for general deterrence, the Tenth Circuit has provided extensive guidance for the sentencing of white-collar defendants such as in this case:

> General deterrence is one of the key purposes of sentencing. Congress has recognized that general deterrence is particularly important in the context of white collar crime. The Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense. The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime. White collar criminals may be particularly susceptible to general deterrence because defendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment.

*United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (citations and quotations omitted). The Tenth Circuit has called general deterrence a "crucial factor" in sentencing decisions for economic crime, noting that the Senate Report for the Comprehensive Crime Control Act of 1983 deemed deterrence to be "particularly important in the area of white collar crime." *United States v. Morgan*, 635 Fed. App'x 423, 450 (10th Cir. 2015) (unpublished) (quoting S.Rep. No. 98–225,

at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (recognizing that deterring white-collar crime is "of central concern to Congress"). Indeed, economic crimes are "prime candidate[s] for general deterrence," being "more rational, cool, and calculated than sudden crimes of passion or opportunity." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L.Rev. 721, 724 (2005)); *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014) ("[G]eneral deterrence is an important factor in white-collar cases, where the motivation is greed."). All of these realities put upward pressure on the sentence.

Finally, a term of imprisonment is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(S). For those reasons, the United States respectfully requests a sentence at the very bottom end of the guidelines. It also requests that all the conditions listed in Doc. 27-1 are imposed.

Respectfully submitted,

RYAN ELLISON
Acting United States Attorney
*/s/ Filed Electronically*
FREDERICK T. MENDENHALL
Assistant United States Attorney
Post Office Box 607
Albuquerque, New Mexico  87102
(505) 346-7274

6

I HEREBY CERTIFY that on November 19, 2025, I filed the foregoing electronically through the CM/ECF system, which caused all counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.


*/s/ Filed Electronically*
Frederick T. Mendenhall, Assistant U.S. Attorney